**In the United States District Court
for the District of Kansas**

———————

Case No. 2:20-cv-02035-TC

———————

KELLI BARGE,

*Plaintiff*

v.

O'MALLEY'S INC., ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

    Kelli Barge filed this premises liability action against O'Malley's Inc. and William Porter, a shareholder of O'Malley's, because she was raped by two unknown assailants inside the O'Malley's bar in Manhattan, Kansas. Doc. 126 at ¶¶ 3.a & 4.a.1. Defendants moved for summary judgment, asserting O'Malley's had no duty under Kansas law to protect her from the crimes of unknown third parties. Doc. 127. For the following reasons, Defendants' motion for summary judgment is granted.

**I**

**A**

    Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are

1

irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1138 (10th Cir. 2011); *see also Allen v. Muskogee,* 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

O'Malley's Inc., is a Kansas corporation that owns and operates the O'Malley's bar in Manhattan, Kansas. Doc. 136 at ¶¶ 1–2. William Porter and his former business partner, Michael Troute, opened O'Malley's in 1998 and operated the bar together for nearly 20 years before Troute's death in late 2018. *Id.* at ¶¶ 3–4.[1] O'Malley's is located in Aggieville, a bar district near Kansas State University. *Id.* at ¶ 2. Given its proximity to the university, O'Malley's patrons skew young, Doc. 136 at 26, ¶ 12, and on weekend nights the bar draws large crowds, *id.* at 27, ¶ 20 (uncontroverted as to weekends being busy).

---

[1] Porter became the sole shareholder of O'Malley's after Troute's death. Doc. 126 at ¶ 2.a.4.

The weekend of February 17, 2018, the K-State rodeo was in town, and O'Malley's was busier than usual, *id.* at 27, ¶¶ 21–23.

Near closing time on February 18, Kelli Barge, a KSU student, arrived at O'Malley's. Doc. 136 at ¶ 7. The bar's layout included a main, or "big," side with a capacity of nearly 100 people and a smaller, adjacent room known as O'Malley's Alley. Doc. 139 at ¶¶ 19–20. While it is unclear how many people were in each side that night, around 150 to 200 people were there in total. *Id.* at ¶ 20. The bar had door guards checking IDs, roaming security personnel, and security cameras present—although the cameras were inoperable that night. Doc. 128 at ¶ 32. The women's restrooms were located in the main side and, according to O'Malley's, were surrounded by patrons, with a doorman posted a few feet away. Doc. 139 at ¶ 23.

Barge went to use the restroom and attempted to lock the door. Doc. 136 at ¶ 8. Two male patrons opened the restroom door. *Id.* at ¶ 9. One pinned her arms while the other raped her. *Id.* Barge left the restroom and immediately reported the incident to a Riley County Police Department officer she found behind O'Malley's. Doc. 136 at ¶ 9.

RCPD Officer Garrett Lloyd arrived to process the scene. Doc. 128 at ¶ 18. But O'Malley's employees had already started cleaning the restrooms, as they apparently were unaware of the assault. Doc. 128-6 at 3; Doc. 128-8 at 2. As officers processed the scene, Barge was taken for medical care and a sexual assault evidence examination. Doc. 136-1 at 5.

Although the exact distance is disputed, it is uncontroverted that the women's restroom was less than 20 feet from the main bar. Doc. 136 at ¶ 10. A table of patrons was less than four feet away from the restroom door. *Id.* at ¶ 11. Officer Lloyd noted that the restroom was "right in the middle of the bar" and expressed surprise that a rape could happen in such a location. Doc. 128 at ¶ 19; Doc. 136 at ¶ 19 (controverted to note that Lloyd also said a rape was not impossible). Barge's expert confirmed this observation: he testified that he was unaware of any similar rape happening in any bar filled with patrons, conceding that it would be very unusual anywhere. Doc. 128-7 at 6.

Lloyd tested the door's lock. Doc. 136 at ¶ 20. The restroom lock was a residential lock that looked to be haphazardly installed, appearing "cockeyed" and jammed in "to fit the right way." Doc. 139 at ¶¶ 35, 37. There was no deadbolt lock on the door. *Id.* at ¶ 40. While the two

3

sides contest some of Lloyd's findings, at a minimum, Lloyd determined that there was no evidence of forced entry. *Id.* at ¶ 34

During the course of the police investigation and this lawsuit, the parties' experts examined Aggieville's criminal history and previous criminal activity within O'Malley's. Doc. 128 at ¶ 13. In the two years preceding Barge's sexual assault, four incidents of rape were reported. Doc. 136 at ¶ 27 (controverted as to foundation of police reports and their completion). None of the rapes took place inside of a bar and two of them involved acquaintance rape. *Id.* at ¶ 28 (controverted as to foundation). Porter testified that he had no knowledge of the four prior rapes in the Aggieville district. Doc. 128 at ¶ 29.

At a broader level, the Aggieville district represents less than one percent of Manhattan's total square mileage but, according to Barge, sees a disproportionate share of violent crime. Doc. 136 at 25, ¶ 2; Doc. 139 at ¶ 2 (controverted that the area saw a disproportionate number of violent crimes preceding Barge's sexual assault). Manhattan police conduct visible foot patrols in Aggieville to keep the peace and break up criminal activity or fighting. Doc. 136 at 25, ¶ 3.

As for the O'Malley's environment, Barge contends that warning signs were abundant. She argues that O'Malley's was chronically mismanaged, with patrons overserved, employees drinking on the job, and Porter himself involved in a skirmish. *See* Doc. 136 at 25–27, ¶¶ 8–9; Doc. 139 at ¶¶ 8–9 (controverted, as Porter testified he was involved in a "skirmish" and that Lloyd testified that O'Malley's was the place of "the average kind of drunken college behavior). Employees were often underage and poorly trained, and the bar suffered from high turnover. Doc. 136 at ¶ 32. The installed security cameras were not functioning, Doc. 136 at 28, ¶¶ 27–28; Doc. 139 at ¶¶ 27–28 (uncontroverted for purposes of this motion only), and O'Malley's was aware that at least one of the locks for another restroom was not working, Doc. 136 at 29, ¶ 43; Doc. 139 at ¶ 43. Barge further alleges that O'Malley's employees were aware of a March 2016 incident where a man entered the bar and attempted to drug female patrons and employees, Doc. 136 at 26, ¶ 11, and the bar was the scene of sexual harassment of females, Doc. 136 at 9, ¶ 9; Doc. 139 at ¶ 9 (uncontroverted as to Lloyd's testimony).

Taken together, Barge argues that O'Malley's was unsafe and created a dangerous environment that led to her assault. O'Malley's, for

4

its part, argues that these facts did not put it on notice that a violent assault like the one Barge survived was likely to occur. Doc. 128 at 19.

Barge asserts two claims. Doc. 126 at ¶ 4.a.1. She seeks to impose premises liability on O'Malley's for its failure to exercise reasonable care to keep the premises safe and for its failure to warn of the dangerous condition in the women's restroom. *Id.* She also seeks to pierce O'Malley's corporate veil to directly reach Porter and hold him personally liable for her damages. *Id.* at ¶ 3.a. Defendants moved for summary judgment on both claims.[2] Doc. 127.

## II

Defendants' motion for summary judgment is granted. Barge contends that Defendants may be held responsible under a premises-liability theory for the intentional, criminal acts of the two men who raped her in the O'Malley's restroom. Doc. 126 at ¶ 3.a. Because Barge has not shown that O'Malley's owed her a duty as a matter of Kansas tort law, Defendants are entitled to summary judgment.

## A

Barge's claim arises under Kansas tort law.[3] Doc. 126 at ¶ 1.d. Negligence claims, such as Barge's premises liability claim here, require a duty owed by one person to another, a breach of that duty, a causal

---

[2] Barge named Porter, the sole remaining shareholder of O'Malley's, as a defendant in this action in order to equitably impose personal liability on him for the corporate damages. *See generally NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993) (describing the cause of action). All facts surrounding O'Malley's corporate history and form, which would be necessary to analyze such a claim, are omitted because O'Malley's is entitled to summary judgment.

[3] A federal court, sitting in diversity, must "apply the substantive law of the forum state." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014). That law can arise from state statute or from decisions of the state's courts. *See, e.g., Wood v. Eli Lilly & Co.*, 38 F.3d 510, 513 (10th Cir. 1994). Where, as here, there is no controlling state decision on this exact scenario, "the federal court must attempt to predict what the state's highest court would do." *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003).

connection between the breached duty and the injury, and damages. *Calwell v. Hassan*, 925 P.2d 422, 428 (Kan. 1996). "Whether a duty exists is a question of law." *Schmidt v. HTG, Inc.*, 961 P.2d 677, 693 (Kan. 1998). Duty, in turn, can depend on foreseeability, which is ordinarily a question of fact. But sometimes that too may be determined as a matter of law. *See Shirley v. Glass*, 308 P.3d 1, 9 (Kan. 2013) (citing *South ex rel. South v. McCarter*, 119 P.3d 1 (Kan. 2005)). For example, only "when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law." *Beshears ex rel. Reiman v. Unified Sch. Dist. No. 305*, 930 P.2d 1376, 1384 (Kan. 1997) (citing *Kan. State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587 (Kan. 1991)).

The general rule is that business owners or operators are "not the insurer[s] of the safety of [their] patrons or customers." *Seibert v. Vic Regnier Builders, Inc.*, 856 P.2d 1332, 1338 (Kan. 1998). "The owner ordinarily has no liability for injuries inflicted upon patrons or customers by the criminal acts of third parties" on the owner's premises, "as the owner has no duty to provide security." *Id.*

But that rule is not absolute. A duty may arise if "circumstances exist from which the owner could reasonably foresee that its customers have a risk of peril above and beyond the ordinary and that appropriate security measures should be taken." *Id.* To determine whether there was a foreseeable risk "above and beyond the ordinary," Kansas and other states favor a "totality of the circumstances" approach in which the foreseeability of criminal conduct takes into account the nature or character of the business, location, and prior incidents of crime. *See id.* at 1335–36; *see also McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 900 (Tenn. 1996); *Reitz v. May*, 583 N.E.2d 1071 (Ohio Ct. App. 1990); *Isaacs v. Huntington Mem'l Hosp.*, 695 P.2d 653 (Cal. 1985). The factors considered must bear "a direct relationship to the harm incurred in regard to foreseeability." *Seibert*, 856 P.2d at 1339.

In *Seibert*, the Kansas Supreme Court considered a case where a woman was robbed and shot in the parking garage of a shopping center. *Id.* at 1334. She pursued a negligence claim against the owner for failing to provide security. The trial court granted summary judgment, reasoning under the prior-similar-incidents test that the plaintiff had not shown a sufficient number of similar violent robberies in the parking garage. *Id.* Reversing and rejecting the similar incidents test, the Kansas Supreme Court wrote:

6

> Prior incidents remain perhaps the most significant factor, but the precise area of the parking lot is not the only area which must be considered. If the parking lot is located in a known high crime area, that factor should be considered. For instance, one should not be able to open an all-night, poorly lit parking lot in a dangerous high crime area of an inner city with no security and have no legal foreseeability until after a substantial number of one's own patrons have fallen victim to violent crimes. Criminal activity in such circumstances is not only foreseeable but virtually inevitable.

*Id.* at 1339. Still, the *Seibert* court acknowledged that:

> It is a sad commentary on our times that there is probably no shopping center parking lot that is likely to be crime free. Thefts of vehicles and from vehicles do occur[] . . . . It is only where the frequency and severity of criminal conduct *substantially exceed the norm* or where the totality of the circumstances indicates the risk is foreseeably high that a duty should be placed upon the owner of the premises to provide security.

*Id.* (emphasis added).

### B

Taking the uncontroverted facts and viewing disputes in Barge's favor, no jury could conclude, under the totality of circumstances, that the risk of a rape at O'Malley's was foreseeably higher than the norm or that the totality of the circumstances indicates the risk was so foreseeably high that O'Malley's had a duty to protect Barge from the on-premises rape committed by unknown patrons that occurred here. As a result, O'Malley's is entitled to judgment as a matter of law.

In its summary judgment papers, O'Malley's argues that it could not reasonably foresee Barge's rape. *See* Doc. 128 at 19 (citing *Seibert*, 856 P.2d at 1332). Its argument has two main parts: first, that there were no prior similar incidents at O'Malley's or at other bars in Aggieville, and second, that the Aggieville district is not a high-crime area. *Id.* at 19. O'Malley's points to the fact that there has never been a reported rape or sexual assault at the bar, *id.* at ¶ 13, and that the Aggieville district—while certainly a hot spot for drunken fights—lacks any

known history of violent sexual assaults like the one on Barge, *id.* at 21–22. O'Malley's further argues that the record "demonstrates a complete absence of evidence that crime in and around Aggieville posed a security problem for O'Malley's such that it was placed on notice for the need of greater security measures than it already provided." *Id.*

Barge disagrees, claiming that her rape was foreseeable. Doc. 136 at 35. She points to the following facts, which she asserts could lead a reasonable jury to find foreseeability under a totality of circumstances approach: Aggieville's location near KSU and its status as a drinking district; a disproportionate amount of crime in Aggieville, which O'Malley's sits in the middle of; O'Malley's status as a spot known for drunken fights; the fact that a man once tried to drug women at the bar; the general fact that after 10 p.m., the bar is mostly patronized by college-aged adults; installation of the locks on the restroom door; Porter's alleged knowledge that the bar was consistently over capacity; that the risk of sexual assault goes up in an environment with younger patrons drinking alcohol; that O'Malley's was aware of patron-on-patron sexual harassment at its facility; a known practice among patrons of both genders using both restrooms; and that O'Malley's knew that the women's restroom where Barge was raped had only one lock that was poorly installed and finnicky. *Id.* at 33–35.

Reasoning that a "lion-tamer does not need to lose a hand before he knows to use a stool," Doc. 136 at 35, Barge claims that Kansas law imposes a heightened duty on O'Malley's based on the above facts. She then seeks to hold against O'Malley's the fact that it had certain security in place—ID checks, sexual harassment ejection policies, and security guards and roaming employees. To Barge, these security efforts are indicia of foreseeability. *Id.* at 36. She claims that because O'Malley's took these steps, it had "an appreciation of the unique risks Defendants' business posed to its patrons." *Id.* Cumulatively, she argues that these facts raise the inference that O'Malley's did foresee, or should have, the probability that an attack could occur. *Id.* (citing *Seibert*, 856 P.2d at 1332).

To overcome the ordinary rule that business owners are not responsible for the safety of their patrons against independent acts of third parties, Barge selectively quotes from the Restatement (Second) of Torts, § 344 (1965). Doc. 136 at 36–37 (quoting portion of comment f.). She focuses on the general awareness of criminal conduct as discussed in the latter part of the comment. But the entire comment undermines her point:

> f. Duty to police premises. Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

Restatement (Second) of Torts § 344 cmt. f (1965). The key here is that the general rule imposes no duty unless the owner has reason to know that his or her operations pose a greater-than-usual risk to patrons. *See, e.g.*, *Seibert*, 856 P.2d at 1338–39.

To be sure, there are Kansas Supreme Court cases imposing liability on business owners for the crimes of others. But they share a common thread involving a failure to act in the face of known danger. In *Kimple v. Foster*, 469 P.2d 281, 284–85 (Kan. 1970), for example, the plaintiffs were injured in an attack by a group of other patrons who had been drinking and brawling in the bar for several hours. The *Kimple* court concluded that there were sufficient facts to permit a jury to find that the defendant was on notice that danger could befall his patrons. *Id.* Those facts included knowledge of harassing behavior and brawling by the same group of patrons on *the same day* in *the same bar* and knowledge that these specific patrons had a general tendency toward rowdy behavior. *Id.* at 285. In short, the proprietor saw the threat, did nothing, and allowed it to metastasize until it harmed the plaintiff.

In another third-party case, *Gould v. Taco Bell*, 722 P.2d 511, 514–15 (Kan. 1986), the Kansas Supreme Court allowed a case to go to the jury where the plaintiff was attacked by another patron. Like in *Kimple*, the aggressor was known to management and had been involved in a similar attack two weeks prior. *Id.* Moreover, one of the business's

9

employees actively watched the plaintiff as she was attacked and did not intervene or call the authorities even after observing that she was in danger. *Id.*

Similarly, in a more recent case, the Kansas Supreme Court found that a tavern owner could reasonably foresee an injury to the plaintiff from another patron where the owner was aware of, and arguably facilitated, potential violence. *Hammond v. San Lo Leyte VFW Post #7515*, 466 P.3d 886, 891–92 (Kan. 2020). The *Hammond* court concluded that the establishment owed the plaintiff a duty to protect him from the harmful acts of the third party "as soon as it reasonably became aware of the risk of harm." *Id.* at 891. The harm was foreseeable because the proprietor knew of the attacker's violent propensities from a prior incident, had actual knowledge of verbal conflict between the attacker and plaintiff inside the bar, and then forced the plaintiff to exit the bar while watching the attacker and his friends follow into the parking lot. *Id.* On these facts, the risk of peril was foreseeably "above and beyond the ordinary." *Id.*

That common thread is absent here. Unlike in *Siebert*, there is no evidence to establish that O'Malley's was aware of a higher-than-average general risk to its patrons based on either the character of O'Malley's or the nightlife and drinking culture in Aggieville. 856 P.2d at 1332. There is no evidence of any prior rape or sexual assault at O'Malley's, Doc. 128 at ¶ 13, or in any other Aggieville bar. While there was some criminal activity in the greater Aggieville area, it was not enough to put O'Malley's on high alert, like the high-crime parking lot described in *Seibert* or the previous aggressive conduct in *Gould*. *See* 722 P.2d at 515–16.

The previous sexual assaults in Aggieville that Barge points to—four rapes between January 2016 and March 2018, *see* Doc. 128 at ¶ 23—confirm this point. None happened at a bar, much less in a restroom located so near so many other patrons. One involved a minor and occurred in a nearby park. *Id.* at ¶ 27. Two involved acquaintance rape that happened in private residences in the Aggieville area. *Id.* And the last incident involved a woman who consensually left a bar with a man who later assaulted her at an unknown, off-premises location. *Id.* None of these incidents, even if known to O'Malley's or Porter, made the risk of a rape so foreseeably high as to impose a duty on O'Malley's to prevent third-party criminal conduct. *See Hammond*, 466 P.3d at 891–92.

As noted, to create a duty, the "frequency and severity of criminal conduct [must] substantially exceed the norm." *Seibert*, 856 P.2d at 1339. The evidence proffered fails to indicate uncommon behavior in a college-town bar district. Unlike the muggings in *Seibert* or failure-to-intervene scenarios like *Gould* or *Hammond*, there is nothing to suggest an on-premises rape was likely to occur. Indeed, even Plaintiff's expert testified, a rape occurring inside a bar would be very unusual anywhere. Doc. 128 at ¶ 17.

Equally unavailing is the March 2016 incident involving a patron who attempted to spike drinks. There, the uncontroverted evidence establishes that O'Malley's, upon learning of the incident, immediately banned the individual and nothing more occurred. Doc. 136-12 at 7. The attack on Barge is not so similar as to justify a finding of foreseeability. *See, e.g.*, *Hammond*, 466 P.3d at 892–93. Had it (or a similar crime) occurred in the bar on a regular basis—like the crime-ridden parking lot in *Seibert*—then perhaps it would have put O'Malley's on notice and created a duty. *Seibert*, 856 P.2d at 1339. Explicit in *Seibert* is the commonsense notion that an owner cannot operate its land in circumstances where harm from criminal activity "is not only foreseeable but virtually inevitable." *Id.* The evidence does not suggest (much less support the notion) that Barge's rape was not only foreseeable but virtually inevitable because, two years earlier, an individual tried, and failed, to spike the drinks of female patrons.

Finally, taking ordinary safety measures is not an indication that O'Malley's foresaw the likelihood of rape in its bar. *Contra* Doc. 136 at 36. Specifically, Barge points to evidence that O'Malley's has a zero-tolerance policy for sexual harassment and disruptive behavior, trains on drink-safety awareness, employs bouncers, and maintains a $1,000,000 insurance policy to argue that O'Malley's knew it was an unsafe business. This argument, for which Barge offers no law in support, misapprehends the foreseeability standard. "Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account." *Gragg v. Wichita State Univ.*, 934 P.2d 121, 135 (Kan. 1997) (citing *Cupples v. State*, 861 P.2d 1360, 1372 (Kan. Ct. App. 1993)). The security measures she cites exist to prevent common risks in a bar: fighting, sexual harassment, and incidents like groping or unwanted contact. Of course, a sexual assault *could* happen and is certainly fathomable. But fathomability is not the test. The test under Kansas

11

law is whether a given event is likely enough under the totality of the circumstances that a reasonably prudent person would consider it foreseeable. *Gragg*, 861 P.2d at 1372. Again, even Plaintiff's expert acknowledged that he was unaware of any similar rape happening in any bar filled with patrons, conceding that it would be very unusual anywhere.

It truly is a "sad commentary on our times" that no public space is completely safe or free of crimes. *Seibert*, 856 P.2d at 1339. But Kansas law does not make business owners the insurers of their customers' safety absent a showing of particular danger above and beyond ordinary perils. *Id.* at 1338. Nothing in the facts produced in this case suggests that O'Malley's had, or should have had, the heightened awareness required under law. And there are no facts to suggest that anyone in O'Malley's observed the two assailants threatening Barge and failed to respond. Thus, there is no genuine dispute that O'Malley's owed no duty to protect against patron-on-patron rape. Accordingly, O'Malley's is granted summary judgment on the premises liability claim.

### III

For the foregoing reasons, Defendants' motion for summary judgment, Doc. 127, is GRANTED.

It is so ordered.

Date: March 14, 2022                             s/ Toby Crouse
                                                 Toby Crouse
                                                 United States District Judge